Filed 5/31/16  In re Connor M. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re CONNOR M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>CONNOR M.,<br><br>      Defendant and Appellant. | A143236<br><br>(San Francisco County<br>Super. Ct. No. JW136215) |

The juvenile court found that minor Connor M. committed the second degree murder of 20-year-old Cameron Myers.  Cameron was, in Connor's own words, a "nice" guy who planned to join the military, but he made a life-ending decision to hang out in San Francisco with a group of young people he believed to be his friends.  Connor was committed to the Department of Juvenile Justice, Division of Juvenile Facilities (DJJ) for a maximum time of confinement of seven years.  On appeal, he contends the second degree murder finding was unsupported by substantial evidence, as the evidence demonstrated that he acted in defense or imperfect defense of another.  He also contends the juvenile court abused its discretion in committing him to the DJJ because there was no evidence that he would probably benefit from the commitment and that there was no less restrictive alternative.  We reject Connor's arguments, and we affirm.

1

## BACKGROUND

On the night of May 14, 2013, a group of eight young people drove from Grass Valley to San Francisco to hang out and party. The group consisted of Connor (15), his brother Mason M. (17), Mathew T. (16), Connor's girlfriend Cheyenne C. (17), Cheyenne's best friend Abby F. (17), Phillip Krulisky (20), Andrew Zamora (23), and Cameron (20).[1] Connor and Mason had been friends with Mathew for about a year and a half, and Connor had been dating Cheyenne for about two weeks. Phillip had known Cameron for about six months, and he, Cameron, and Andrew had been hanging out together for a few months prior to May 2013. The rest of the group met Cameron on May 14.

The group left Grass Valley in the evening, caravanning to San Francisco in two cars. In the early morning hours of May 15, they found their way to the end of Arelious Walker Drive, a long, largely vacant dead end street in the Hunters Point neighborhood of San Francisco. There, Cameron was assaulted in an unprovoked attack, the ultimate outcome of which was Connor's admitted stabbing of him. The group fled, leaving mortally wounded Cameron behind.

A nearby resident heard Cameron's screams and called 911. He was alive when emergency responders found him, but he died shortly thereafter. He suffered eight sharp force injuries to his head, torso, and upper extremities, including a chop-type wound to the back of his head, three stab wounds to his right shoulder and back (one of which punctured his right lung), and two puncture wounds on his right hand and two on his forearms (all four of which were defensive). He also suffered 18 blunt traumatic injuries consistent with kicks or punches, including on his forehead, left cheek, head, back of the neck, left leg, and both arms and hands.

On May 20, 2013, the San Francisco District Attorney filed a Welfare and Institutions Code section 602 petition charging Connor with Cameron's murder

---

[1] Because Connor and many of the witnesses were minors, and in keeping with the briefing, we use first names when referring to most of the witnesses.

(Pen. Code, §§ 187, 189) and alleging that the crime was willful, deliberate, and premeditated and that it was a violent and serious felony (*id.*, §§ 667, subd. (a), 667.5, subd. (a)–(c), 1192.7, subds. (a), (c)). In separate petitions, Mason and Mathew were also charged with murder in the first degree.[2]

A joint contested jurisdictional hearing took place over the course of 10 days in June and July 2014. Connor's defense was that he acted in defense or imperfect defense of Mathew. At the conclusion of the hearing, the juvenile court found that Connor had committed second degree murder. It found his testimony "quite credible," but explained: "Cameron was clearly retreating and was pursued by Mathew and that happened twice. So, even if we had an imperfect defense of another under this case the problem—and that you reasonably believed Mathew was in danger, the problem in this case, there was more force used than was reasonably necessary to thwart off any danger. On the other hand, I do find that there was no premeditation or intent. So the Court finds that Connor—that the allegations of a violation of Penal Code Section 187 as a murder in the second degree are true." The court also found the second degree murder allegation true as to Mathew (whom the court did not find to be credible), but found that the prosecutor did not meet his burden of proof as to Mason.

At the dispositional hearing, the court again addressed its finding, stating: "I do want to correct a statement that's been made several times by minor's counsel that I might have found that he acted in perfect—imperfect self-defense. What I stated and what I found was that even if he had been able to make a case for imperfect self-defense, the level of violence exceeded what would be allowed under that defense. So I just want to be very clear about my findings."

Connor's counsel zealously argued for an alternative disposition to a DJJ commitment, but after considering extensive evidence, the court ordered Connor committed to the DJJ for a maximum time of confinement of seven years.

---

[2] Andrew was charged with Cameron's murder, but all charges against him were dropped.

3

## THE EVIDENCE

### The Prosecution's Case

### *Cheyenne C.*[3]

On May 14, 2013, Cheyenne, who lived in Grass Valley, agreed to go to San Francisco with Connor, whom she had been dating for about two weeks. Around 7:00 p.m. that evening, Connor showed up at her house with Mason, Mathew, Andrew, Phillip, and Cameron, all of whom arrived in Andrew's car. Cheyenne had known Mathew and Mason for years, but it was the first time she had met Andrew, Phillip, or Cameron. Andrew said he lived in San Francisco and would show them around. They all left in Andrew's car and picked up Abby, and then some split off with Cameron to pick up his car. After regrouping, they stopped at a fast food restaurant, and then were finally on their way to San Francisco, Cameron driving his car with Cheyenne and Connor, and Abby driving Andrew's car with everyone else.

Along the way to San Francisco, they made several stops, including at a grocery store where Mathew stole a bottle of alcohol. Cheyenne saw Connor drink some of that alcohol, but the bottle was kept in Andrew's car on the drive. Everyone except Cameron was smoking marijuana.

The caravan stopped at a gas station, and while Cameron was pumping gas, Connor walked over and spoke to the people in Andrew's car. He returned to Cameron's car and told Cheyenne that the others were talking about beating up Cameron and stealing his car. He told her that if they succeeded, they would become Blood gang members, and he was going to be a part of it. Cheyenne did not want to have anything do with it and wanted to be dropped off on the side of the road, but Connor would not let her out.

At some point, they parked the cars, and Cheyenne and Abby walked away to find a bathroom. As they were walking, the boys (all but Cameron, who was getting something out of his car) were walking behind them, and Cheyenne heard "bits and pieces" of a conversation—probably between Mathew and Connor—about "car" and

---

[3] Cheyenne and Abby testified subject to grants of immunity.

4

"stealing" and "little things like that." The girls continued to walk, and Cheyenne asked Abby if she thought the plan was going to happen. Abby said she did not think so. Cheyenne and Abby returned to the cars, and the group drove off in the same seating configuration as before.

After a short drive—it was now the early morning of May 15—they turned down a road near the San Francisco Bay and parked in a cul-de-sac at the end. Cheyenne was high by this point. Everybody got out of the cars, but because it was cold, Cheyenne and Abby got back into Andrew's car after a few minutes, and the others all walked out of sight towards the bay.

A few minutes later, Andrew returned and told Abby to move the car. She drove it 50 to 100 yards up the road away from the cul-de-sac. Abby told Cheyenne that she did not think the boys were going to go through with the plan, but she told them that if they did, they should kill Cameron.

A minute or two later, Cheyenne saw figures moving in the dark. It looked like there was one person on the ground—she assumed it was Cameron—and all the others were surrounding him, "fighting," "kicking, punching, stuff like that." She was unable to distinguish any individuals in the dark. The group of people then ran towards the car, with Mathew the first to get there. His hands were "cut to the bone." Everyone except Cameron got in the car, with Connor the last one in. Cheyenne saw Cameron "running for his life" up a hill with most of the back of his shirt covered in blood. Everyone in the car yelled at Abby to drive away, which she did.

They started to look for a hospital because of the injuries to Mathew's hands. Unable to find one, they stopped at a gas station to buy bandages, and Andrew took over the driving. From there, they drove to Mathew's mother's house in Sacramento. While on the road, Connor described what had happened: Mathew had started a fight by punching Cameron in the back of the head. Cameron pulled out a hatchet and threw it at Mathew, who picked it up and threw it back at Cameron. Cameron then pulled out a knife and swung it around, slicing Connor on his nose. Mathew started punching

Cameron, and Connor pulled out a knife and stabbed Cameron. Mason said he kicked Cameron in the head five times.

At some point during the drive, Connor showed Cheyenne a key that he said was Cameron's car key. He told her Andrew had the key and had given it to Mason, and Connor ended up with it. He then threw it out the window.

Also on the drive, Mathew told everyone to tell his mother that he and Connor were jumped by some men at a store, and his hands were cut when he pushed Connor out of the way.

They arrived at Mathew's mother's house, and Mathew told his mother the story he had contrived on the car ride. She called for an ambulance, which took him to the hospital. Cheyenne, Abby, and Connor were still there when the police arrived, while the other three (Andrew, Phillip, and Mason) had left.

Later that day, Cheyenne learned Cameron had died. She told Connor, who was "scared and shocked but like kind of happy at the same time" because Cameron would not be able to "snitch."

A few days after the incident, Cheyenne talked to Mathew, who told her, "You got my back, right? You know. I wouldn't do something like this." Cheyenne took that to mean he was telling her not to snitch on him.

In a police interview a few days after the assault, Cheyenne told the officers that in the car on the way to Sacramento, Mathew said that Connor, not Cameron, cut his hand. Connor had agreed with Mathew, saying that Mathew was punching Cameron while he was stabbing him and he, Connor, cut Mathew's hand.

### Abby F.

Abby was invited by Cheyenne, her best friend, to go to San Francisco with the group. Abby had known Mathew, Mason, and Connor for a few months, and she met Andrew, Phillip, and Cameron that day. She brought a large amount of marijuana with her. They made a few stops, including one for alcohol, and then headed to San Francisco in two cars: Cameron driving his car with Cheyenne and Connor, and Abby driving

6

Andrew's car with the rest of the group and the alcohol. While they were driving, they were just listening to music and smoking marijuana.

It was dark when they got to San Francisco. They first went to Pier 39, and from there drove to a gas station, with Abby, Cheyenne and Phillip in Andrew's car and everyone else in Cameron's car. Connor smelled like alcohol and appeared drunk by that time, "slurring his words a little" and acting unsteady on his feet. While they were at the gas station, Connor told Abby that either "he" or "they"—Abby could not recall—were going to beat Cameron up and take his car. She did not take him seriously. She told Cheyenne what Connor said but told her not to worry because they were not going to do it. Phillip also talked about the plan in the car, but Abby was telling him to calm down because it was not going to happen.

They left the gas station, drove to a cul-de-sac at the end of a road, and parked. After hanging out for about 10 minutes, Cheyenne and Abby got back into the car, while the boys were walking around. Abby was telling Cheyenne nothing was going to happen when Mathew walked up to the car and said, "It's going to happen now," and told Abby that she was going to drive the car away. Abby did not want to see any violence and did not want any part of what was going to happen, so she drove Andrew's car back up the road. Suddenly, she saw "a whole bunch of chaos," "little things moving around" in the cul-de-sac. She next saw Mason and Phillip walking towards them, so she started driving to them. She then saw Mathew, who had blood all over his hand, so she stopped the car to let him in. Everyone looked panicked, and she could tell something was "weird," so she told them to get in the car. Everyone except Cameron got in, with Connor the last one in.

Looking around, Abby saw Cameron walking towards them. He stopped, sat down, put his head down, and laid back. Abby then drove off. Abby started to look for a hospital to get help for Mathew's injuries, but they ended up getting lost so Andrew took over the driving. Abby asked what happened, and somebody said that Connor had stabbed Cameron.

They drove to a gas station to buy supplies to bandage Mathew's hands. Abby asked Mathew what happened and "he kind of like laughed and said, 'Connor did this.' " They then drove to Mathew's home in Sacramento. On the drive, Connor said everyone had been "chilling" when all of a sudden Mathew started a fight by hitting Cameron in the back of the head. Everyone in the car discussed telling Mathew's mother that Mathew was injured when he and Connor were jumped by a guy in Haight-Ashbury.

When they got to Mathew's mother's house, Mathew was taken away in an ambulance, after which Abby, Connor, and Cheyenne went outside. Abby again asked what happened, and Connor told her they started fighting, someone hit Cameron in the back of the head ("there was an ax involved or something"), and he stabbed Cameron seven times. He also said that his nose was cut when Cameron swung a knife at him. Abby, Connor, and Cheyenne went to sleep at Mathew's house, while the others left.

At 5:00 a.m. on May 15, the police arrived at Mathew's house, looking to speak with Connor. Abby overheard Connor initially telling them he was not with Mathew, and then telling them that they got jumped in Haight-Ashbury.

After returning home, Abby read in the news that Cameron had died at the hospital. She told Cheyenne to read the news. She also texted Phillip, "I read the news and the problem is gone." She testified that the "problem" was Andrew. She did not remember texting Phillip, "The nigga didn't make it" in response to his question, "What do you mean the problem is gone?"

Abby was interviewed by the police on May 31. She told them that Mathew said he hit Cameron in the back of the head and knocked him down. She also told them that Connor kept telling her that if she called an ambulance or the police, she would get into trouble as well. He kept saying, "Don't call the cops. Don't call the cops. I'm going to jail forever for this."

### *Sacramento County Deputy Sheriff Todd Hoganson*

Around 4:00 a.m. on May 15, Deputy Hoganson responded to a call of a stabbing victim in Sacramento. He arrived at Mathew's house as Mathew was being loaded into an ambulance. The deputy asked Mathew who he was with when he was injured, and he

8

said his friend Andrew, who had left. There were numerous other individuals standing around outside, and they all denied they were with Mathew when he was injured.

A little while later, Deputy Hoganson interviewed Mathew at the hospital. This time, Mathew told him that he had gone with Connor, Andrew, and some girls to San Francisco and parked in the Haight-Ashbury. He and Connor had taken a walk when they were approached by four men, two of whom had knives. Without provocation, the men tried to stab him, and his hands were cut when he tried to defend himself from the attack. Connor was nicked on the nose by one of the men swinging a knife. As he and Connor ran away, one of the assailants threw a hatchet towards them. The deputy saw two lacerations on Mathew's left hand and one very severe one (to the bone with the artery visible) on his right hand.

Deputy Hoganson returned to Mathew's house to speak with Connor. This time, Connor admitted he was with Mathew when he was injured. He claimed Mathew, Andrew, a friend of Andrew's, and he had gone to San Francisco. They parked on a hill overlooking the bay and were hanging around outside the car when a man suddenly appeared with a knife and tried to stab them. When he attempted to stab Mathew, Mathew blocked the knife. The man swung the knife at Connor and nicked him on the nose. They jumped in the car and fled, driving directly back to Mathew's house.

### San Francisco Police Inspector Robert Velarde

San Francisco Police Inspectors Velarde and Dedet interviewed Connor on May 19.[4] Connor initially told the inspectors that the group was hanging out by the water when Mathew and Cameron started fighting. Cameron pulled out a knife and swung it, cutting Connor on the nose. Connor said he had no idea what happened next because he "blacked out." The next thing he knew, they were heading back to the car, Mathew's hands were cut, and Mathew, Andrew, and Phillip were telling him he had stabbed Cameron.

---

[4] A videotape of the interview was played for the court.

Connor then gave the inspectors another version of the incident:  After Cameron swung the knife at him, Mathew told Cameron to put the knife down.  Instead, Cameron pulled out a hatchet and threw it at Mathew.  Connor told the inspectors he then "ran up and then I started stabbing him because I was scared, I thought he was—he cut my face and he threw a hatchet at Mathew and I didn't know what to do at all.  I thought—I thought it was either I'd die and my friend dies or I stab the man and that's what I did and then we ran back to the car and Mathew's hands were cut up and we got in the car and went to Sacramento."  Connor told the inspectors Cameron was standing when he started to stab him.  He did not know how many times he stabbed Cameron, but he thought he "got him one more time" when Cameron fell to the ground.  He claimed he did not know that Cameron had been hit in the back of the head.

During a break in the interview, Connor was left alone with his mother and stepfather.  He told them that someone made Cameron "put his knife down," and then Mathew threw a hatchet at him.

**The Defense**

*Connor*

In May 2013, Connor was living in Grass Valley, having moved there at the end of eighth grade.  He had three brothers, including Mason, who was two years older than him.  He lived with his mother, stepfather, and two brothers.[5]  He met Mathew, who was Mason's age, when he moved to Grass Valley and they became close friends.

A week prior to Cameron's death, Mathew came to stay at Connor's house.  He told Connor he got jumped into the Norteño gang by stealing a car and selling it to a chop shop.

On May 12, Connor, Mathew, Andrew, Phillip, and a girl went to Fresno.  During that trip, there was talk, mostly by Andrew but also by Mathew, of gang activity and committing theft.  Andrew claimed he was a member of the Bloods gang and that he stole electronics to make money.  Mathew said he was a Norteño and had stolen a car.  On the

---

[5] Connor's father was in prison.

drive back from Fresno, they were talking about going to San Francisco for Mathew's birthday, and Andrew asked if the others would steal cell phones with him. Connor "was kinda just saying yeah just to like kinda act cool," but he was not serious about it.

On the day of May 14, Connor was excited about the San Francisco trip because he had just met Phillip and Andrew, who were older, he would be with his girlfriend and brother, and they were supposed to have a fun time and party. That evening, the group picked up Abby (who brought a jar of marijuana), and then drove in Andrew's car to Auburn, where Cameron got his car. They stopped at a restaurant for the girls to get some food. While the girls were eating, Conner was leaning up against one of the cars when Cameron walked up and said to Mathew, "[O]h, you found Bessy." Mathew responded, "[Y]ou named your hatchet, that's kinda weird."

The group ultimately headed to San Francisco in two cars: Abby drove Andrew's car with Andrew, Phillip, and Mathew, while Cameron drove his car with Connor, Cheyenne, and Mason. From the restaurant to San Francisco, Connor and Cheyenne rode in Cameron's car the entire way. At some point on the drive, Connor saw Cameron pull a hatchet out from under his seat and put it in the center console of his car.

In Sacramento, they stopped at a grocery store where Mathew stole a large bottle of alcohol. Back on the road, all of the passengers in Cameron's car were drinking alcohol out of cups, while the bottle was in Andrew's car.

By the time the group reached San Francisco, it was dark outside. They went to Pier 39 and walked around. Connor said he wanted to go somewhere cool, and Mathew said he wanted to go somewhere with a view. Andrew looked at Mathew and said he knew the perfect spot. Connor was "pretty drunk" by this time.

When they left Pier 39, Abby was still driving Andrew's car because he appeared to be drunk. Connor again went in Cameron's car with Cameron, Cheyenne, and possibly Mason. They stopped at a gas station, and while Cameron was getting gas, Connor walked behind a bush to go to the bathroom. When he was walking back, he saw Andrew and Mathew talking. One of them—Connor could not remember who—told him, "[W]e're gonna beat Cameron up and take his car." Connor responded,

"[W]hatever, dude, like I'm getting drunk, I'm hanging out with my girlfriend," and he walked away.

Connor walked back to the cars, leaned into Andrew's car, and told Abby that Mathew and Andrew wanted to beat Cameron up and take his car. He then got back into Cameron's car and told Cheyenne the same thing. He did not think they were really going to do it. He never noticed any tension between Cameron and either Mathew or Andrew, testifying that Cameron was "nice the whole time." He denied telling Cheyenne that they were all going to beat up Cameron and take his car, or that he was going to become a Bloods gang member.

From the gas station, they drove to a cul-de-sac. Once the cars were parked, everyone got out and was standing around. Shortly, Cheyenne said she was cold so she and Abby got into Andrew's car. All of the boys walked to an area with a bench.

Connor and Mathew sat down on the bench, Mathew on the left, Connor on the right, while everyone else stood around looking at the water. After five or ten minutes, Mason and Phillip said something like, "[L]et's go back" and started walking back towards the cars. Connor and Mathew stood up, and as Connor turned, he saw Mathew swing and hit Cameron in the back of his head. Cameron stumbled forward with his hand on the back of his head and said, "[W]hat the fuck, who hit me, why did you hit me?" Cameron turned to face them, and Mathew answered, "I hit you because you flexed on me." Connor had not seen anything in Mathew's hand, and he thought he had punched Cameron.

Mathew took a couple of steps towards Cameron, who pulled out a knife. He started swinging it at Mathew, trying to fend him off. Mathew jumped back and said, "[O]h, fuck, my hand, you cut my hand." Connor stepped forward to get between them, and Cameron took a step toward him, swinging his knife and cutting Connor across the bridge of his nose. Connor was shocked because he did not know what was going on.

Cameron started running up the trail toward the cars. Mathew started chasing after him, and Connor, Mason, and Phillip all started jogging after Mathew. Connor acknowledged that it was clear to him that Mathew had attacked Cameron from behind,

Cameron did not want to fight anybody, and Mathew was chasing him down and attacking him.

When Connor got to the cul-de-sac, he saw Cameron near the driver's side of his car facing Mathew. It was "pretty dark" but he could see Cameron holding his knife up in front of him about shoulder level, and Mathew also holding something in front of him. Mathew was yelling at Cameron, "kinda laughing a little bit, saying . . . put your fucken knife down, put your knife down . . . ." Cameron was saying, "I don't know what I did, I don't know why you guys are doing this, just like leave me alone, I don't know why, like I don't know why you guys are doing this, just stop." As he was talking, Cameron lowered his knife "a little bit": "[H]e kinda put it—like his hand down a little bit (indicating) but he still had it like up not completely up like this (indicating) but he had it like more towards like his like hip area, his stomach area." As Cameron was telling Mathew to stop, Mathew threw something at him, which Connor later learned was a hatchet. The hatchet missed Cameron, who picked up it up and threw it back at Mathew. Mathew ducked to the ground, and the hatchet missed him and flew by Mason's face. Connor was terrified at seeing the hatchet nearly hit his brother in the face.

Cameron again started running, but Mathew got up and tackled him to the ground. They were wrestling, "arms kind of like flailing and like hitting." When asked if Cameron still had his knife in his hand as he ran, Connor testified, "I remember he had it like in his hand when Mathew threw it and then when he threw the hatchet, he started running that way and I remember seeing it in his right hand, he still had it." When asked if he ever saw Cameron put his knife down on something and let go of it during the fight, he answered, "No. He like—because he had his knife down—up like this (indicating) and then when Mathew was screaming at him to put his knife down, he like put it down. Like he wasn't holding it up high anymore and that's when Mathew threw the hatchet at him (indicating)." Connor admitted, however, that he did not see a knife in Cameron's hand when they were struggling on the ground.

Asked what was going through is mind while Cameron and Mathew struggled on the ground, Connor answered, "The hatchet was just flying through the air and he was

13

just like swinging a knife around and I saw it go by my brother's face and I was—I was scared, I didn't know what was—I didn't know what was going on." Connor then ran up, opening the blade on a switchblade knife he had in his pocket, and "stabbed Cameron to like stop them from doing what they were doing because I thought Mathew was gonna get stabbed and I just wanted to stop it." When asked why he stabbed Cameron, Connor answered, "Because I thought like Mathew was gonna get stabbed, because he'd already cut like me and my—Mathew and I just wanted to stop everything. Like everything was just going on and it didn't need to happen and I was just trying to pretty much stop Mathew from getting stabbed." When asked another time why he intervened in the fight, Connor answered: "I was—I was just trying to like get him and Matt apart and I thought Mathew was gonna get stabbed and I didn't want my friend to get stabbed so I just—I just did it. It was just like so quick I didn't have time to think of it. I just didn't want Mathew to get stabbed." He did not try to pull them apart because he thought Cameron still had a knife and he did not want to get stabbed himself.

Connor stepped back and was "completely shocked" because he "had stabbed someone and [he] knew that it wasn't right." He then threw his knife towards an area of bushes on the side of the road.

Someone—possibly Mason—was helping Mathew back to the car, and as Connor ran towards the car, he saw Cameron running and then lying down. He heard Abby yelling to "finish him" and Mason yelling at him to get in the car. He got in the car and Andrew "popp[ed] up out of nowhere" and got in the front seat. Mathew was screaming because of the cuts on his hands, and they all drove away.

On the drive, everyone was yelling about what happened, and Connor said that Mathew started a fight with Cameron, Cameron cut Mathew and himself, Mathew and Cameron threw the hatchet back and forth and then wrestled to the ground, where Connor then stabbed him. While they were in the car, Andrew handed Connor some keys that he said were Cameron's and told him to throw them out the window, which Connor did.

Connor was spacing out on the drive back from San Francisco, but he remembered Abby yelling that they needed to get Mathew to a hospital, Andrew saying they could not

go to a hospital in San Francisco, and Mathew screaming that he was losing a lot of blood and to take him to his mother's in Sacramento. He also remembered Mathew telling him a fake story about how they got jumped in Haight-Ashbury and Mathew got stabbed when he pushed Connor out of the way. That is the story he told the sheriff the next day when he was questioned.

A few days after the incident, Mathew and his father came by Connor's home. Mathew's father told Connor that he knew the real story and said, "[Y]ou're going to make sure Mathew doesn't get in trouble for this, you're going to make sure he doesn't go down for this, right?"

On May 18, Connor was interviewed by San Francisco Police Inspectors Velarde and Dedet. Connor admitted he initially told them that after Cameron took a swing at him and cut his nose, he blacked out, and when he came to, Mathew, Phillip, and Andrew told him he had stabbed Cameron. He claimed he told that false story because he did not want to get in trouble. He also acknowledged that during the interview, he whispered to his parents, " 'He made him put his knife down and fucking because he had his knife open like this, made him put his knife down.' " Connor testified at the jurisdictional hearing that he meant that Cameron lowered the knife but it remained in his hand. He testified also that he never saw Cameron put his knife down on something and let go of it, explaining that when "Mathew was screaming at him to put his knife down, he like put it down. Like he wasn't holding it up high anymore . . . ."

Connor acknowledged that in the police interview, he said that Cameron had pulled out the hatchet and threw it at Mathew. He testified, "I said that because I wasn't trying to blame Matt for what he did—like what happened, I was kinda trying to protect Mathew." He was also trying to protect Mathew when he told the police that Cameron was standing when he first stabbed him and then he stabbed him a second time after he was on the ground; he did not want to say that Mathew had tackled him to the ground.

15

He claimed he never told them anything about Cameron and Mathew struggling over a knife because he did not "want to put Mathew on the ground with Cameron."[6]

### Mathew

In May 2013, Mathew lived in Sacramento with his mother, but in mid-May he was staying with Connor, Mason, and their family in Grass Valley. Mathew considered Mason his best friend and Connor like a brother.

On the afternoon of May 14, Mathew was hanging out in Grass Valley with Connor, Mason, Phillip, Andrew, Cameron, and a few other friends, when Andrew, who was from San Francisco, told the group he wanted to take Mathew to San Francisco for his birthday. Phillip, whom Mathew had known for about two and a half years, had introduced Mathew to Andrew on May 12 when a group of them went to Fresno. At that first meeting, Andrew said that he was a Bloods gang member from San Francisco and that he made his money by stealing electronics. Mathew thought Andrew was shady and not someone you would want to hang out with.

On the evening of May 14, after picking up Cheyenne and Abby and getting Cameron's car, the group stopped at a burger place and Mathew's mother's house. It was also possible they stopped at a gas station before reaching San Francisco, but Mathew did not recall at the time of trial. During the drive, Mathew asked Andrew about himself, including whether he worked. Andrew said he did not, adding, " 'I rob people for like electronics, like iPods and laptops and stuff and I turn them into [*sic*] pawn shops . . . .' " At one of the stops on the way to San Francisco, Andrew again brought up the idea of robbing people. Andrew tried to convince Connor to participate in "illegal activity," and Connor feigned interest but Mathew did not think he was actually interested. Mathew denied that it was then that a plan was made to rob Cameron of his car, claiming he was never part of any such conversation. He testified there was no need to rob anyone because Abby had marijuana and money for gas. He acknowledged that while they were

_____

[6] Connor called multiple witnesses who knew Mathew. We omit discussion of their testimony (much of which concerned Mathew's propensity for dishonesty and troublesome behavior), as it is irrelevant to the issues on appeal.

16

in Andrew's car, he heard Andrew and Connor talking about "possibly pulling a lick on someone in San Francisco . . . ."

It was late by the time they arrived in San Francisco. They briefly stopped at Pier 39, where they looked at the view and smoked marijuana, and the girls used the restroom. From there, they drove through Haight-Ashbury, stopped briefly in a neighborhood where Andrew was from, and then drove out to Arelious Walker Drive to look at the view, smoke more marijuana, and relax.

They parked in the cul-de-sac at the end of the street, and everyone got out and started walking down a trail to a bench. Mathew and Mason walked ahead, while Andrew, Cheyenne, and Abby lagged behind. Mathew and Mason sat down on the bench, Mason on the left and Mathew on the right. Connor, Phillip, and Cameron walked up behind them. Andrew caught up with them and said that the girls had gone back to the car to get a jar of marijuana, although Mathew assumed he told them to move Andrew's car. Cameron walked up to the right side of the bench and stood a few feet to the right and in front of Mathew. Andrew walked up behind Cameron, pulled a hatchet out of his pocket, hit Cameron in the back of the head with it really hard, and then headed towards the path leading back to the cars. Mathew denied he was the one who hit Cameron in the head with the hatchet.

Cameron stumbled forward, covering his head with his hands and yelling, " 'What the fuck' " and " 'Who hit me?' " He straightened up and turned to face Mathew and Mason, who had gotten up off the bench. Cameron pulled out a knife, ran towards Mason, and started swinging the knife at him. Mathew stepped in front of Mason and put his hand up to try to grab the knife, and Cameron stabbed him in his left hand.

Mathew and Mason took a few steps back, and Connor, who had a closed switchblade knife in his hand, ran in front of him and pushed Cameron back. Connor switched open his blade and stood in front of Mathew and Mason, yelling at Cameron, " 'Why the fuck did you stab my brother.' " Andrew stepped up next to Connor with the hatchet still in his hand, and Cameron ran off towards the cars. Connor and Andrew chased after him, and Mason, Phillip, and Mathew took off running behind them.

When they got to the cul-de-sac, Andrew's car was not where they left it, having been moved up the road. When Mathew and Mason were a few feet from the cul-de-sac (Phillip having fallen behind), Mathew saw Cameron at the driver's side door of his car, with Andrew running around the car one way and Connor running around the other way, surrounding Cameron. Cameron still had a knife in his hand, and Andrew still had the hatchet in his hand. Cameron tried to open the driver's door, but someone had locked it. When Cameron discovered the door was locked, he put his knife on the hood of the car and said, " 'I give up,' " and " 'I'm sorry for whatever I did wrong, I don't know what I did. If you guys just leave me alone and go away, I won't tell no one what happened.' " Andrew laughed and swung the hatchet at Cameron but missed. Cameron grabbed Andrew's arm, wrestled the hatchet out of his hand, pushed him away, and threw the hatchet in his direction. Andrew dropped to the ground, and the hatchet flew past him and towards Mathew and Mason, who were about 15 feet away. They, too, ducked out of the way.

Cameron took off running empty handed, and Connor, who had a knife in his hand, ran after him. Connor caught up to Cameron, pushed him to the ground, and stabbed him repeatedly. Mathew ran over and got between Connor and Cameron "[b]ecause it was too much. Connor was doing too much to Cameron." He pushed Connor back and told him quit stabbing Cameron. Mathew tried to help Cameron up, but Cameron pushed him away. Mathew told him, " 'I'm trying to help you, you know, I'm not here to hurt you.' " When he grabbed Cameron's arm a second time, Connor "stabbed over [him] and like sliced through [his] hand," cutting his right hand to the bone. Cameron started "stumble jogging" away. Mathew denied that he wrestled Cameron to the ground, held him down, or punched him while he was on the ground. He also denied that at the spot where Cameron was stabbed, the other boys all surrounded him and kicked him.

Mason came over and helped Mathew get to Andrew's car. Cheyenne, Abby, and Phillip were already in the car, and Mason and Mathew got in the back seat. Mathew saw Cameron running up the street, screaming, " 'Help me, call 911.' "

18

Andrew and Connor ran up to the car and asked if Mathew was okay, and he told them he needed to go to the hospital. He asked what they were doing, and Andrew responded, " 'You know we need to go finish him.' " Andrew and Connor left for about a minute and a half, heading off in Cameron's direction, before returning and getting in the car. Andrew got in the driver's seat and drove away.

In the car, Mathew repeated that he wanted to go to the hospital, but Andrew did not want to go to a hospital in San Francisco because the doctors would ask questions. Mathew was bleeding heavily, "bawling [his] eyes out," and panicking. They stopped at a gas station, where they bought first aid supplies, and Abby wrapped his hands.

Mathew denied that on the car ride out of San Francisco, he told everyone that Connor cut his right hand while he, Mathew, was punching Cameron and Connor was stabbing him. He also denied telling the others in the car that he started the entire incident by hitting Cameron in the back of the head. He claimed that there had been no agreement to attack Cameron and rob him.

Mathew asked to be driven to his mother's house in Sacramento. When they got there, she called 911, and he was taken by ambulance to a hospital.

Mathew admitted that he falsely told his mother and a police officer that he was injured when he and Connor got jumped by some people in Haight-Ashbury. He denied that he concocted the story, claiming Andrew had made it up to avoid suspicion. Mathew went along with the idea because he was scared and did not know what was going to happen.

On the morning of May 17, Mathew told his father what had, according to Mathew, really happened. They did a search on his father's phone and discovered that Cameron had passed away. His father drove him to two parks in an effort to locate others who were involved. They went to Connor's house, where his father confronted Connor. According to Mathew, Connor told his father that Mathew was not involved, and his father told Connor that he better make sure Mathew was not arrested. They also went to Cheyenne's house, where Mathew's father spoke to Cheyenne's mother. Mathew denied that while he was going over the events with his father, he concocted the story that

19

Andrew hit Cameron with the hatchet instead of himself. He also denied that they were looking for other participants to tell them to keep quiet about what happened.

The following morning, May 18, Mathew went to the Nevada County Sheriff's Department, where he was interviewed by a deputy sheriff. He was subsequently interviewed by San Francisco homicide inspectors Velarde and Dedet.

Mathew denied that he associated with the Juggalos gang. He acknowledged that he had friends who were Juggalos and that the logo for the Juggalo gang is a clown with a hatchet.

## DISCUSSION

### The Trial Court's Finding that Connor Committed Second Degree Murder Was Supported by Substantial Evidence

In his first argument, Connor contends that the trial court's finding that he committed second degree murder was unsupported by the evidence. This is so, he argues, because the evidence, as purportedly found by the court, established that he killed Cameron in defense of Mathew or, at the least, in the imperfect defense of Mathew. As he explains it: "[B]ased on its express statements, and particularly its acceptance of Connor's version of the events as credible, the court found that Mathew initially attacked Cameron, and that Cameron drew a knife and cut Mathew's hands and Connor's nose. Mathew, who was unarmed, then pursued Cameron, who was still armed with the knife, and ultimately tackled him, and struggled with him on the ground. Connor, believing Cameron still had the knife and would again stab Mathew, rushed in and stabbed Cameron to protect Mathew. Because Connor's actions present a classic case of defense of another, or at least imperfect defense of another, the Court should reverse the finding on the murder charge." To agree with Connor's argument requires us to conclude that the record established defense of another as a matter of law. This, we cannot do.

Murder is "the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187.) " 'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements . . . that would support a conviction of first degree murder. [Citations.]' [Citation.] Malice may be express or implied.

20

[Citation.] Malice will be implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. [Citations.]' [Citations.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 623–624; Pen. Code, § 188 [malice exists when an unlawful homicide was committed with the intention unlawfully to take away the life of another].) " 'Malice exists, if at all, only when an unlawful homicide was committed with the "intention unlawfully to take away the life of a fellow creature" [citation], or with awareness of the danger and a conscious disregard for life [citations].' " (*People v. Randle* (2005) 35 Cal.4th 987, 994–995 (*Randle*).)

A homicide is considered justified—and thus not criminal—when defendant acted in self-defense or in defense of another. (*Randle, supra,* 35 Cal.4th at p. 994; Pen. Code, §§ 197, subd. (1), 199, 694.) For a killing to be in self-defense or in defense of another, defendant's acts causing the victim's death must be motivated by an actual and reasonable belief or perception that he, or the person being defended, was in imminent danger of death or great bodily injury, that his acts were necessary to prevent the injury, and that a reasonable person in the same circumstances would have had the same perception and acted similarly. (*Randle, supra,* at p. 994; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

California recognizes another doctrine pertinent to our discussion: the doctrine of imperfect defense of another, which negates the element of malice and reduces a homicide to manslaughter. (*People v. Genovese* (2008) 168 Cal.App.4th 817, 829 ["One who kills in imperfect defense of another—in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—lacks malice and is guilty only of manslaughter."]; accord, *Randle, supra,* 35 Cal.4th at pp. 996–997.) A defendant acts in imperfect defense of another where (1) defendant actually believes that another person is in imminent danger of being killed or suffering great bodily injury, and (2) defendant actually believes that the immediate use of deadly force is necessary to defend against the danger, but (3) at least one of those beliefs is unreasonable.

(CALCRIM No. 571; 1 Witkin, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 245, p.1071; *Randle, supra,* at pp. 996–997.) Imperfect defense of another is distinguished from perfect defense of another by the unreasonableness of defendant's actual belief that someone else was in imminent danger of harm or that the use of deadly force was necessary to defend against the danger. (CALCRIM No. 571.)

Against this legal background, we must determine whether the record contains substantial evidence tending to support the juvenile court's second degree murder finding. (*In re Roderick P.* (1972) 7 Cal.3d 801, 809.) "In considering the sufficiency of the evidence in a juvenile proceeding, the appellate court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. We must presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence [citation] and we must make all reasonable inferences that support the finding of the juvenile court. [Citation.]' " (*In re Babak S.* (1993) 18 Cal.App.4th 1077, 1088–1089; accord, *In re Roderick P., supra,* 7 Cal.3d at p. 809.) "Substantial evidence is 'evidence which is reasonable, credible, and of solid value . . . ." (*In re Gary F.* (2014) 226 Cal.App.4th 1076, 1080.) Construing the record in the light most favorable to the court's finding, our review of the evidence reveals substantial evidence supporting the second degree murder finding.

First, there was the amount of force Connor used. Abby testified that Connor admitted he stabbed Cameron seven times. This was consistent with the findings of the medical examiner, who testified that Cameron suffered three deep stab wounds to his back and shoulder (one of which punctured his lung), as well as four other cuts to his hands and arms. Seven stab wounds. *Seven.* The sheer brutality of this attack suggests Connor acted deliberately and with conscious disregard for Cameron's life, and contradicts his self-serving testimony at the jurisdictional hearing that he acted out of an actual belief that he needed to use deadly force to defend Mathew.

22

Also supporting a malice finding was the testimony by Cheyenne, Abby, and Connor himself about the plan to assault Cameron and steal his car. Cheyenne testified that while at a gas station in San Francisco, Conner told her that the others were talking about beating up Cameron and stealing his car in order to become members of the Bloods gang and that he was going to be a part of it. Abby likewise testified that Connor told her about a plan to beat Cameron up and steal his car. And Connor himself testified that he knew about the plan, although he claimed, contrary to what both Cheyenne and Abby said, that he was not a part of it.

Further, there was evidence from which the court could have concluded that Connor did not actually believe Cameron was still in possession of a knife when he was struggling with Mathew. First, Connor was inconsistent in his accounts of what was going on when he stabbed Cameron, telling several versions before finally claiming he stabbed Cameron in an effort to defend himself or Mathew. Cheyenne testified that Connor described how Mathew had started a fight by hitting Cameron in the back of the head, Cameron swung a knife around and nicked Connor on the nose, Mathew and Cameron threw a hatchet back and forth, Mathew chased after Cameron and wrestled him to the ground, and Connor stabbed Cameron. Similarly, Abby testified that Connor said that someone hit Cameron in the back of the head and he then stabbed Cameron seven times. There was no testimony that as Connor related those events, he told his companions he thought Cameron had a knife and was going to kill Mathew so he intervened in the fight to save Mathew's life. The same was true during his interview with the San Francisco police inspectors, when he initially claimed that he blacked out and, after he came to, was told he had stabbed Cameron. Additionally, Connor told the inspectors that Cameron was standing when he first started to stab him, and he thought he "got him one more time" when Cameron fell to the ground. This contradicted his subsequent claim that Cameron and Mathew were struggling on the ground, and he believed Cameron was going to stab Mathew. And, significantly, Connor admitted at the jurisdictional hearing that he did not see a knife in Cameron's hand during the struggle.

23

Finally, there was his ambiguous statement to his parents during his police interview in which he described Cameron having "put his knife down."

The undisputed evidence also showed that Cameron was the victim of an unprovoked assault and was attempting to retreat. He retreated after initially being hit in the back of the head and attempting to defend himself by swinging the knife at Connor. He then ran to his car, where he was again confronted by Mathew and again tried to flee. There was no evidence supporting a belief that Cameron was the aggressor—he was solely trying to defend himself and escape with his life. Indeed, Connor acknowledged that it was clear to him that Mathew had attacked Cameron from behind, Cameron did not want to fight anybody, and Mathew was chasing him down and attacking him. Despite this, Connor made no other attempts to separate Mathew and Cameron, such as pulling them apart or telling Mathew—the clear aggressor—to stop. Instead, Connor joined in the assault of him, inflicting, again, *seven* stab wounds.

Testimony of Cheyenne and Abby also suggested there was a group assault on Cameron, which was consistent with the findings of the medical examiner that he suffered 18 blunt traumatic injuries consistent with kicks or punches. Cheyenne described seeing figures moving in the dark. It looked to her like there was one person on the ground—she assumed it was Cameron—and all the others were surrounding him, "fighting," "kicking, punching, stuff like that." She also testified that in the car Connor said he had stabbed Cameron while Mathew was punching him, and Mason said he kicked him in the head five times. Abby described seeing "a whole bunch of chaos," "little things moving around" in the cul-de-sac. From this, the court could have concluded that Connor stabbed Cameron as part of a group assault, consistent with the plan to assault him and steal his car.

Despite this evidence supporting the court's second degree murder finding, Connor contends that his offense must be reduced to voluntary manslaughter because the

evidence established that he acted in the imperfect defense of Mathew.[7] As he explains it, "[B]ased on its express statements, and particularly its acceptance of Connor's version of the events as credible, the court found that Mathew initially attacked Cameron, and that Cameron drew a knife and cut Mathew's hands and Connor's nose. Mathew, who was unarmed, then pursued Cameron, who was still armed with the knife, and ultimately tackled him, and struggled with him on the ground. Connor, believing Cameron still had the knife and would again stab Mathew, rushed in and stabbed Cameron to protect Mathew. Because Connor's actions present a classic case of defense of another, or at least imperfect defense of another, the Court should reverse the finding on the murder charge." In light of the substantial evidence outlined above, we cannot agree that as a matter of law Connor acted in the imperfect defense of Mathew. But beyond that, Connor's argument is flawed for multiple reasons.

First, Connor attributes to the court findings it did not make. Nowhere did it find that Connor actually believed Mathew was in imminent danger of being stabbed and that he actually believed he needed to use deadly force to defend Mathew, both of which findings were necessary for it to conclude Connor acted in imperfect defense of Mathew. The genesis of Connor's error is the court's statement that it found his testimony "quite credible." He conflates that statement, however, with the court accepting every aspect of his testimony. The latter conclusion finds no support in the record. Mathew's and Connor's version of Mathew's role in the assault varied dramatically, with Connor identifying Mathew as the instigator and pursuer and Mathew blaming it on Andrew. The court's statement that it did not find Mathew's "testimony very credible," but found Connor "quite credible" could simply have meant that it found Connor's testimony regarding Mathew's involvement more believable than Mathew's denial of any culpability. And, by finding that Connor committed second degree murder, the court necessarily found that he acted with malice, which means it did not believe that he

---

[7] We need not address Connor's contention that he acted in the perfect defense of Mathew. Under no reading of the evidence can it be said that the use of deadly force was reasonably necessary.

25

actually believed Mathew was in imminent danger of harm and that he actually believed he needed to use deadly force to defend him.

Second, contrary to Connor's claim, the court did not state that it found the imperfect defense of another inapplicable because Connor used too much force. What it did say was this: "So, *even if* we had an imperfect defense of another under this case the problem—and that you reasonably believed Mathew was in danger, the problem in this case, there was more force used than was reasonably necessary to thwart off any danger." (Italics added.) And this: "What I stated and what I found was that *even if* he had been able to make a case for imperfect self-defense, the level of violence exceeded what would be allowed under that defense." (Italics added.) The court's use of the phrase "even if" is dispositive: it signals a contrary finding, that is, that it did *not* find the elements of imperfect defense of another satisfied.

Third, the juvenile court considered the jury instructions and, as noted, CALCRIM No. 571 set forth the elements of imperfect defense of another. As stated in *In re Julian R.* (2009) 47 Cal.4th 487, 499, " '[W]e apply the general rule "that a trial court is presumed to have been aware of and followed the applicable law. [Citations.]" ' [Citation.] 'This rule derives in part from the presumption of Evidence Code section 664 "that official duty has been regularly performed," ' and thus when 'a statement of reasons is not required and the record is silent, a reviewing court will presume the trial court had a proper basis for a particular finding or order.' [Citation.]"

Finally, Connor's position is premised on a faulty assumption, that the amount of force used is irrelevant to the question of whether an assailant acted in imperfect defense of another. In other words, Connor could have stabbed Cameron 20, 30, even 40 times, and that would have no bearing on whether he acted in imperfect defense of Mathew because the doctrine allows the defendant to be mistaken about the amount of force that was necessary. But the amount of force can be relevant where, as here, it undermines the veracity of a defendant's claim that he used deadly force because he actually believed it was necessary.

26

**The Court Did Not Abuse Its Discretion in Committing Connor to the DJJ**

In his second argument, Connor contends that the juvenile court abused its discretion in committing him to the DJJ because there was no evidence he would probably benefit from the commitment and there were less restrictive placement alternatives available. We disagree.

***The Probation Department's Recommendation for a DJJ Commitment and Connor's Opposition***

On August 14, 2014, the San Francisco juvenile probation department filed a dispositional report and recommendation that Connor be committed to the DJJ, as follows:

"Connor had a tough time adjusting to being detained at [juvenile hall]. At that time, he was the only white kid in the unit. His first six months in custody were a difficult adjustment period for him. [Connor] was picked on and often provoked into fights by non-white Unit 7 detainees. He seemed to be an angry and confused young man who was forced to defend himself at each provocation. Connor had no choice but to defend himself or become a target for bullies on the unit. As result [*sic*], he received several disciplinary write-ups.

"In between the disciplinary write ups, Connor has shown some growth as he adjusted to life in Juvenile Hall. One benefit of being detained, if any, is that Connor has detoxed and attained sobriety. As the fog cleared, Connor's behavior improved. With the exception of one incident, he has not gotten into any fights in 2014 and has managed to get along with staff, teachers and co-detainees. Connor is participating in the programs made available to him at [juvenile hall] such as Omega, San Dimas, Each One Reach One, and OTTP. As part of Each One Reach One Connor participated in a writing workshop and wrote a one man play that was performed by professional actors for an event at [juvenile hall]. He is also developing a knack for drawing. Connor is well liked by staff and has become popular amongst his peers. He now seems to be responding well to structure and discipline.

"However, the undersigned is concerned about the lack of remorse from Connor. The most recent example is the chalk drawing that Connor made in the Unit 7 courtyard. The drawing depicts a cartoony image of himself with arms outstretched wearing a gold chain medallion with a '$' symbol. He wrote a slogan in the background which says 'Free Connor M[.]' and a second slogan saying 'I wanna go home'. Furthermore, the undersigned observed Connor's behavior for the entire duration of the trial. On numerous occasions while transporting the minor and his brother to and from court, the undersigned had to admonish the minor's [*sic*] about their playful behavior. The most troubling example occurred after the Medical Examiners testimony. During that hearing, the victim's mother was so upset, that she ran out of the court room when pictures of the victim's mortal injuries and testimony of how her son died was given. On the way back from that particular hearing, the minor was more concerned about getting back to Juvenile Hall in time to play flag football in the gym. He claimed to be one of the best athletes in the hall.

"Another example occurred in the public hallway outside of Dept. 2. On our way to court, one of the minor's relatives made a comical gesture toward Connor. Connor replied with a comical gesture of his own and both laughed aloud in front of the victim's mother (who was looking directly at Connor) and numerous others who were waiting to go into the courtroom including Sheriff Deputies who were clearing the hallway. After this incident, the undersigned was compelled to advise the minor's counsel to give notice to her client.

"The undersigned met with Connor in the Multi Purpose Room on 8/1/14 to discuss his case and possible outcomes. In this meeting, the undersigned mentioned concerns about his behavior throughout the trial and his drawing in the Unit 7 court yard and how this all conveys a sense of lack of remorse for his admitted actions. He explained that he feels bad and had many sleepless nights and stress related to the incident. He said that as part of his therapy, he was advised to not think about it and to put himself in a different space.

28

"After all is said and done, the undersigned believes that Connor will need to participate in Victim Awareness and a Restorative Justice Program. Connor needs to understand the person whose life he took was described as a happy, playful and kind person. The victim was loved by his family and friends. Connor will also need treatment and therapy for alcohol and substance abuse. He can also benefit from a program that will address his academic and vocational needs.

"Accountability for his actions and the consequences must be part of Connor's rehabilitation. This was an unprovoked and senseless murder. Therefore, the gravity of this offense warrants the most restrictive disposition for the protection of the community and the safety of others."

On August 21, 2014, Connor filed opposition to the probation department's recommendation. He requested one of three dispositions: a long-term, structured therapeutic residential program, juvenile hall with continuing therapeutic services, or Log Cabin Ranch for one year until he turned 18 years old followed by a one-year adult residential treatment program. He contended that he would not benefit from a DJJ commitment because the DJJ lacked an appropriate substance abuse treatment program and could not meet his therapeutic treatment needs due to ongoing problems with use of force in the facility and a lack of mental health services. He also argued that there was no evidence that all less restrictive options had failed to rehabilitate him because this was his first sustained petition. Finally, he contended that he had shown that he was amenable to treatment and rehabilitation in a structured therapeutic environment that the DJJ could not provide.

Connor's opposition was supported by an assessment of clinical social worker Marynella Woods, who believed that placement "in a therapeutic, pro-social, structured setting where he is likely to thrive, would be the most appropriate plan for long term, effective rehabilitation." Connor also appended a psychological assessment of clinical neuropsychologist Amanda Gregory, Ph.D., who recommended "placement in a structured rehabilitation program that includes interventions that address his history of conduct problems, the impact his behavior has had on others and himself, and helps him

29

continue to work on taking responsibility for his behavior" and provides "strong role models and interventions to address his substance abuse/dependence and mental health issues . . . ." Also appended to Connor's opposition were the following documents: a letter from a substance abuse counselor; a letter of apology Connor wrote to Cameron's mother; Connor's academic record while detained in juvenile hall; character references; and extensive documents relating to *Farrell v. Harper* (Alameda County Super. Ct. No. RG 03079344), a 2003 taxpayer action against the then California Youth Authority (CYA) alleging inhumane conditions which resulted in a consent decree aimed at reforming the CYA to reduce levels of violence and provide more education, treatment, and rehabilitation.

On September 15, 2014, Connor filed a motion for alternative dispositional order, asking that the court order one of three dispositions: commitment to Bar-O Boys Ranch for 18 months, followed by one year in Jericho Project (an adult residential treatment facility); out-of-home, out-of-state placement at either George Jr. Republic or Glenn Mills (both located in Pennsylvania); or a one-year commitment to juvenile hall under a structured, therapeutic treatment program, followed by one year in Jericho Project.

On September 18, 2014, the prosecutor filed documents regarding the programs available at the DJJ. The documents detailed the DJJ's intake process, including the mental health, medical, academic, psychological, and psychosocial evaluations that youth undergo upon arrival and the education, substance abuse, mental health, and gang intervention programs available. They also described the Integrated Behavior Treatment Model being implemented at the DJJ to guide the provision of services to the youth committed to the DJJ. Under that model, upon arrival, each youth is assessed to determine needs and strengths in the following areas: education and employment skills, attitudes and thinking skills, mental and physical health, family and community support and stability, peer influence, violence and aggression, and substance use. Using that information, DJJ staff works with the youth and family to develop a treatment plan that will allow the youth to build skills for successful reentry into the community.

On September 22, the probation department responded to Connor's motion for an alternative placement, addressing the three alternatives he proposed. As to Bar-O Boys Ranch, the department advised that it did not have a contract with the ranch (a Del Norte County facility) and that it would take a minimum of six months to negotiate a contract before Connor could be committed there. As to the Glen Mills and George, Jr. Republic facilities in Pennsylvania, the facilities would need a court order for out-of-home placement, but pursuant to Welfare and Institutions Code section 727.1, subdivision (b)(1), "the Court cannot directly order any out of state placement unless minor has exhausted in-state placement, which he has not and he is not eligible due to the seriousness of his sustained charge." Finally, the department advised that juvenile hall "is a short term facility that will not meet Connor's many needs in the long run." This was so because its services are tailored to pre-adjudicated youth, so "there is not much focus on the incident or offense that brought youth to the juvenile hall," therapy and treatment for post-adjudicative youth is different than for pre-adjudicative youth, and its "programs do not focus as much on recidivism risk reduction which should be part of the post-adjudicative therapies."

### Contested Jurisdictional Hearing

A contested dispositional hearing was held over the course of four days in August and September 2014. The following evidence was presented:

Social worker Marynella Woods, who worked in the public defender's office, helped Connor with anger, impulse control, and substance abuse issues. When Connor was first detained at juvenile hall, he was "young, angry, kind of hyper, not much insight." He was placed with the most serious offenders and was one of the youngest in the unit. In the early months, he had a hard time and got into fights that resulted from him being young and a racial minority. But he eventually "learned how to handle the situation and has done very well, made use of services up there." Over the course of his detention, he changed a lot, "growing and thinking about himself and the mistakes he made and how his lifestyle got him here . . . ." Woods worked with helping Connor deal

31

with the feelings surrounding what he did, and he was able "to express tremendous regret and remorse about what happened . . . ."

Woods had referred Connor for interviews at Glen Mills, George Jr., and Rite of Passage because she felt he was "a workable youth" in that he had shown in the year at juvenile hall that he embraced intervention when offered to him and that he could grow and change from it. Connor would be able to stay at the programs until he was 18 and/or graduated from high school. After that, he would become part of the "reentry court," where he would be under the court's supervision and would receive transitional services for reentry. According to Woods, all three facilities "liked him a lot" but had to review his case further because the seriousness of his offense made it difficult for the programs to accept him.

Donna Saffioti Johnson was a substance abuse counselor and prevention education specialist who had been working with Connor on substance abuse issues, which she considered the "key to his history." She described Connor as forthcoming about his substance abuse problem, acknowledging alcohol and marijuana use by the age of 12 or 13. He was able to recognize the effect his substance abuse had on his life, including how it affected his relationships and school behavior, and ultimately led to Cameron's death. While Connor had decided he would no longer drink alcohol, Johnson believed he needed continuing treatment.

Johnson also worked with Connor on anger management, mindfulness, dialectical behavior therapy, emotional regulation, expression, and dealing with grief and loss. By the time of the hearing, he was "a lot more self-contained, a lot more in self-control . . . ." He thought more about consequences and was more mindful and mature.

Johnson helped Connor work on his letter to Cameron's family. She encouraged him to "[j]ust talk about [his] feelings" and "[j]ust let it flow . . . ." He really struggled with the impact it would have on Cameron's family, always weighing if it was going to be more upsetting for them. She believed he was remorseful for what he did, which was significant because empathy would help with future choices and behavior.

32

Alvin Wilkins was a volunteer with a Christian organization that mentors youths incarcerated in juvenile hall and had met with Connor two or three times a month during his detention. At the outset, Connor was immature, but Wilkins had witnessed "tremendous growth" in Connor over the previous four or five months. He believed Connor was "evolving into a person of faith" based on the way he participated with the group and the intensity with which he read and discussed the Bible. Although he had not discussed with Connor the details of his crime, they had discussed forgiveness.

Joseph Tanner, a counselor at juvenile hall, met with Connor on a nearly weekly basis during his detention. He counseled and mentored Connor on his plans for the future. At first, Connor was "[a]ngry, upset, explosive," and they talked a lot about his thoughts and feelings that were making him angry and different strategies for coping with those feelings. Over time, Connor made progress, "there's been some growth." According to Tanner, Connor was doing "[v]ery well" in school while in juvenile hall and had expressed a desire to go to college.

Sean Neil was a San Francisco Unified School District teacher who worked at juvenile hall. He began teaching Connor as soon as he was detained, and Connor had earned A's from Neil. He described Connor as "kind of your typical average high school student" who was "a little bit more motivated than the typical average student . . . ." He believed Connor would "flourish" in a regular school setting outside juvenile hall. He was very studious and respectful, and was a good role model for the other students.

Joey Cordero, from the Young Fathers Program, generally met with Connor weekly in both group and individual settings during his juvenile hall detention to help him recognize the important things in his life and improve the negative things. The letter Connor wrote to Cameron's family was a milestone in their meetings because when they read it together Connor really started opening up and exploring what happened that night. Connor was very remorseful, wished he could take it back, and felt very bad for Cameron's family. Cordero believed Connor's letter of apology was genuine.

Amanda Gregory, an expert in adolescent forensic psychology, began assessing Connor in May 2013 to determine his overall psychological and cognitive functioning.

33

She diagnosed him with anxiety disorder not otherwise specified, with residual symptoms of post-traumatic stress disorder (PTSD), alcohol and cannabis dependence, and disruptive behavior disorder. His symptoms of PTSD resulted from the traumatic experience of witnessing his father physically abuse his mother and from suffering physical abuse at the hands of his father himself. He did not meet the full criteria for PTSD, however.

Gregory recommended that Connor be placed in a structured, long-term residential facility where he would receive treatment from trained professionals that could address his residual symptoms of PTSD and his conduct and substance abuse issues. Specifically, he would benefit from a program staffed by people trained in evidence-based treatment, meaning "treatments that have been studied and actually shown to be effective versus more of a sort of social model, role-model type environment." She believed Connor was amenable to treatment, because he "appear[ed] to have been able to form therapeutic alliances with the people that he's worked with, which is important in terms of being able to do that again in the future, in a new setting. He tried very hard on the testing and he was open, so he was cooperative. He's—he's an intelligent young man, which is helpful in terms of some of the types of therapy. He has support, which can be helpful in terms of improving behavior. And he expresses a desire to stay sober and stay out of trouble."

Gregory believed Connor was genuinely remorseful for killing Cameron. As to the likelihood of Connor reoffending, she believed he had "some strengths, that if those are maintained, then he has a lowered risk of recidivism." These strengths included his amenability to treatment, his "capacity for empathy and he's able to make an emotional attachment . . . ." According to Gregory, if Connor were placed in an environment where he regularly faced the threat of violence, his behavior was likely to deteriorate and revert to being more aggressive.

Gregory acknowledged that juvenile hall was a locked, highly structured facility and that Connor was excelling there.

Elizabeth Buchen, an analyst at the Center on Juvenile and Criminal Justice, authored a report studying the conditions at the DJJ and the progress since the *Farrell* litigation. Buchen's testimony addressed ongoing concerns at the DJJ, such as the levels of violence, the recidivism rate of youth coming out of DJJ, inadequate training of staff, and the state of the physical facilities, among many other issues.

Keri Klein, an assistant public defender for Nevada County, was familiar with Connor from when he was arrested in October 2011 for stealing an ATV and vandalism. That arrest resulted in a Welfare and Institutions Code section 602 petition. The matter was referred for informal probation in June 2012. Klein testified that there were not any subsequent proceedings involving Connor between June 2012 and May 2013, but she acknowledged that she was unaware that Connor was cited on two occasions during that time period.

Kent Burrow was the facility manager at Bar-O Boys Ranch, located in a very remote area in Six Rivers National Forest in Del Norte County. The 42-bed facility contracted with several counties, although San Francisco was not one of them. From time to time, residents have absconded from the facility, including two within the prior year. According to Burrow, fighting between wards was very rare.

The ranch uses a three-step program, with eight months the average completion time for the program. There have, however, been wards who completed the program in four months and others who have been there for upwards of two years. The ranch operates a choice theory model, "[a]ddressing basic needs, quality world, total behavior stuff, and creativity," and also used evidence-based programs, including anger replacement therapy and moral reconation therapy.

The ranch uses a substance abuse intervention program called the matrix model and offers AA meetings. There is a licensed therapist with whom a resident can meet every week, although the wards are not required to participate in individual therapy. There are a number of groups, including anger, victim awareness, and emotional awareness groups.

There is an onsite high school, as well as online college courses for youths who have graduated from high school. There are also vocational training programs, including culinary arts, building construction, and welding programs, and a wildland fire academy. In terms of sports programs, the ranch offered softball, basketball, volleyball, soccer, and other activities.

In agreeing to accept Connor as a ward at Bar-O Boys Ranch, Burrow looked at Connor's prior involvement with the probation department, which was "just kind of knuckle-headed stuff, nothing overtly violent . . . ." Also significant was the court's finding that Connor had not acted with intent or premeditation and Connor's testimony that he was trying to help his friend. Burrow was also impressed with the progress Connor had made while in juvenile hall and that "he was at least seeking the help and he was communicating and trying to take some responsibility for his situation and [using] services that were available to him . . . ." Given all this, Burrow thought Connor was "a kid I can work with . . . ." Burrow acknowledged that his decision to accept Connor was based solely on materials given to him by defense counsel. He was unaware of Connor's history of aggressive behavior and getting into fights before his detention at juvenile hall.

Michael Farmer, a parole agent with the DJJ, worked as an intake and court liaison at DJJ headquarters. He testified regarding the DJJ facilities and programs, as follows:

The DJJ has three facilities (two in Stockton and one in Ventura) and a fire camp. The total population is 700, with 250 the maximum at any facility. When a youth is committed, he is delivered to the DJJ and spends the first 60 to 90 days in a reception unit where he undergoes assessments and screenings. From there, he is assigned to a permanent living unit. Once assigned to a facility, he is assigned a youth correctional counselor, who typically has a caseload of four or five youths.

During the assessment period, the youth goes through a full range of psychological testing and risk assessment to determine what level of care and services he needs so he is placed in an appropriate program. The assessment includes a substance abuse screening and a psychological evaluation to determine if the individual needs therapy.

After the intake period, the youth is assigned to a permanent living unit. The typical day consists of education or work. For those who have not graduated from high school, each facility has a full high school, and the students attend five periods of high school classes as well as treatment groups throughout the day. On a typical weekend, the youth participate in group work, individual sessions with their assigned youth correctional counselor, recreation time, intramural sports, and other activities. Farmer acknowledged an ongoing issue with attendance in the school program.

In addition to high school classes, the youth have access to vocational training. The DJJ's fire camp is one of the larger vocational training programs, but they also offer Microsoft certification courses and programs in culinary arts, landscaping, construction, computer refurbishing, and others. Upon graduation, there are other job opportunities, as well as online college courses that are available through the education program.

The treatment provided is evidence-based treatment, such as Counterpoint, a program to help male offenders develop more prosocial attitudes and make better decisions regarding who they interact with. There is a skill-of-the-week program, where 52 skills are taught on a rotating basis. There is also a 10-week anger interruption program that teaches youth to " '[c]onsider other people's perspectives and control their anger, gives concrete tools to help them think about the end result and then choose alternative actions.' " A youth in need of additional anger management treatment could participate in an advanced practice, where he would continue to work on implementing the skills he had learned.

There are both inpatient and outpatient mental health programs. The inpatient mental health program is for a youth "who is identified as needing a higher level of care, needing more help, assistance in getting through their day." The majority of DJJ youth receive mental health services through the outpatient program. Family therapy is also available.

The substance abuse program is a six-month, 38-session cognitive behavioral program with six modules (motivational engagement, cognitive restructuring, emotional regulation, social skills, problem solving, and relapse prevention). If a youth needs

additional treatment after that program, he can do an advanced practice. Farmer acknowledged that a youth found to be in need of substance abuse treatment may not receive the treatment right away, although he should never have to wait more than six months since the DJJ "pretty much do[es] not have waiting lists for any of our programs . . . based on the reduced size of our population . . . ." Farmer also acknowledged that there are wards who have positive drugs tests.

As to the safety precautions taken, in addition to the staff that is available, there are crisis intervention counselors and parole agents who do crisis resolution if there are incidents that need to be addressed. A program called Project IMPACT, which is co-led by former gang members, addresses gang affiliations and violence. According to Farmer, "[O]ur facilities are definitely not pervasive in a gang culture. We do have—again, we accept the most serious and violent offenses. . . . So we have a high number of individuals who are affiliated or have some association with gangs, but it's by no means the culture of our facilities."

Farmer believed the DJJ offers programs from which Connor would benefit, as it has programs and services available to meet the needs of someone with his offense and background.

### The Court's Disposition

At the conclusion of the hearing, the court ruled as follows:

"It's clear in this case that there's no ideal placement for Connor in terms of what I would want, in terms of his treatment needs, but also taking into account the circumstances and gravity of this offense. I don't think the Bar-O has a long-term therapeutic treatment plan that would be appropriate for him under the circumstances. While I'm not totally happy with the Department of Juvenile Justice, I think it is the appropriate placement for him at this time. [¶] . . .

"At this time, the Court finds an award of custody to the parents would be detrimental to the minor and award to a nonparent is required to serve his best interest. I've weighed and considered less restrictive alternatives, chiefly the one we reviewed today, and I do find them not to be appropriate to his treatment needs, and especially to a

38

long-term program. I just think 8 to 18 months is simply—does not take into account accountability, nor do they have a long-term structured program. Their program is a step program, and I am concerned about what would happen once he completed those."

At that point, counsel for Connor interrupted to asked whether the court had considered an out-of-home placement order so Connor could be evaluated for placement at Glen Mills or George Jr. The court responded:

"I have, but I still think it's appropriate that he go to DJJ. Again, those are short-term—I mean, they're short-term placements in that they can only keep him until he's graduated from high school or through his 18th year.

"I've—I've considered the seriousness of the offense and the circumstances and gravity; the need to protect society; and the fact that even though he's made great gains, there still poses a risk; the value of imposing accountability; the extent of the minor's need for a structured institutional setting; and the programs that are available through DJJ, which, while not ideal by any extreme, have at least improved greatly. It will be really incumbent on Connor to take advantage of those programs. And, candidly, if he does, he'll get good time credit and maybe could move into the fire camp or earn his way to an earlier release."

Taking into consideration the circumstances of the offense and "the fact that [Connor] has benefitted and has taken the initiative with the treatment programs that have been available through juvenile hall," the court set Connor's maximum time of confinement at seven years, with credit for time served.

### *There Was No Abuse of Discretion*

We review a juvenile court's order committing a minor to the DJJ under an abuse of discretion standard. (*In re Edward C.* (2014) 223 Cal.App.4th 813, 829; *In re Teofilio A.* (1989) 210 Cal.App.3d 571, 579) No abuse of discretion exists "where the evidence 'demonstrate[s] probable benefit to the minor from commitment to the [DJJ] and that less restrictive alternatives would be ineffective or inappropriate. [Citation.]' [Citation.]" (*In re Pedro M.* (2000) 81 Cal.App.4th 550, 555–556.) We must indulge "all reasonable inferences to support the decision of the juvenile court." (*In re Asean D.*

(1993) 14 Cal.App.4th 467, 473.) A commitment to the DJJ may be made in the first instance, without previous resort to less restrictive placements. (*Ibid.*) There is evidence in the record before us that Connor's DJJ commitment will probably benefit him and that there was no less restrictive alternative available.

The juvenile court had before it an extensive record detailing the numerous programs available at the DJJ. Upon arrival, Connor would undergo a lengthy assessment to determine what services would benefit him. The services and programs available to Connor include substance abuse treatment, mental health treatment, and an anger interruption program, just to name a few.

The DJJ also offers numerous educational programs from which Connor would benefit. He would be able to attend high school classes and earn a high school diploma. He would also be able to participate in online college courses and vocational programs.

Further, Connor had performed well in the structured, disciplined, locked environment of juvenile hall. He had achieved sobriety, was doing well in school, and had remained largely trouble free after an initial period of acclimation. The DJJ would continue to provide him with a similarly structured, disciplined environment in which he would have the same opportunities and could continue to thrive.

Turning to the second question—whether there was a less restrictive alternative to the DJJ—the evidence supports a finding that there was not. Connor proposed three alternatives to the DJJ commitment recommended by the probation department: (1) an 18-month commitment to the Bar-O Boys Ranch, followed by a year at Jericho Project, an adult residential treatment facility; (2) out-of-state placement at either George Jr. Republic or Glenn Mills, both in Pennsylvania; and (3) a one-year commitment to juvenile hall, followed by a year at Jericho Project. The court considered these alternatives but dismissed them each as unsuitable. Most significantly, the proposed placement alternatives were all short-term options that would not provide the long-term placement that the court believed Connor needed. The court believed this to be an inadequate confinement given "the seriousness of the offense and the circumstances and gravity; the need to protect society; and the fact that even though he's made great gains,

40

there still poses a risk." Connor insists that an additional one-year placement in an adult program would satisfy the court's concern that his offense necessitated a longer placement, but even with that extension, he would complete his sentence before he was 20 years old, less than what the court considered adequate. The programs also failed to adequately take into account public safety and the need for accountability.

There were further problems specific to each of the alternatives. As to the proposed Pennsylvania placements, Woods testified that while the programs "liked" Connor during their interviews, the severity of his offense would make it difficult to accept him. Bar-O Boys Ranch was not suitable because the department did not have a contract with the facility, and it would, according to the probation department, take a minimum of six months to obtain one. Further, the ranch employed a three-step program that, on average, took eight months to complete (with some youths completing it in four months and others in 18 months). Although the facility was willing to consider an 18-month commitment, Connor would lack a structured program once he completed the three steps. This, understandably, was of concern to the court. Further, Connor proposed a one-year program at an adult facility following completion of the Bar-O program, but he could not be evaluated for such a program until he neared his eighteenth birthday, which was a year away. There was thus no guarantee that he would be accepted for such a program. Juvenile hall was likewise unsuitable because it was a short term facility that would not meet Connor's needs. The services at juvenile hall are tailored to pre-adjudicated youth and therefore lack programs needed for youth after adjudication, such as programs focusing on the offense that brought the youth to the juvenile hall and recidivism risk reduction.

Additionally, while Connor contends that "[n]othing in the record indicates that the probation department screened Connor for, or considered, any placement other than DJJ." The record indicates otherwise, as the probation department's report confirmed that the multidisciplinary team considered Connor's case. It discussed the gravity and circumstances of Connor's offense, his prior record (which consisted of burglary, vandalism, and battery), and his admitted alcohol and marijuana use before and on the

day of the murder. In light of these factors, the team ultimately recommended a DJJ commitment. Similarly, the court considered the alternative placements Connor proposed, but rejected each one as unsuitable.

Certainly, and as the juvenile court acknowledged, the DJJ is not an ideal placement. Connor introduced extensive evidence about the ongoing failures of the DJJ that persist despite the remediation required by the *Farrell* consent decree and ongoing oversight by a special master. This evidence suggested that there continue to be problems with violence between wards and drug use by wards, among other continuing problems. But also before the court was evidence that the DJJ had "improved greatly" in the years since the *Farrell* litigation.

The court recognized that the DJJ is "not ideal by any extreme," and Connor identified many deficiencies at the facility. But the record demonstrates that Connor would probably benefit from a DJJ commitment and that there was no less restrictive alternative. There was thus no abuse of discretion.

## DISPOSITION

The judgment of conviction is affirmed.

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


A143236; *P. v. C.M.*

43